## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VANDA PHARMACEUTICALS, INC.,
2200 Pennsylvania Avenue NW
Suite 300E
Washington, DC 20037,

                     Plaintiff,

v.

FOOD AND DRUG ADMINISTRATION,
10903 New Hampshire Avenue
Silver Spring, MD 20993,

ROBERT M. CALIFF, M.D.,
in his official capacity as
Commissioner of Food and Drugs,
10903 New Hampshire Avenue
Silver Spring, MD 20993,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201

and

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human Services,
200 Independence Avenue SW
Washington, DC 20201,

                     Defendants.

Civ. No. 1:22-cv-1432

## COMPLAINT

Plaintiff Vanda Pharmaceuticals, Inc. (Vanda) brings this complaint against the Food and

Drug Administration (FDA), Robert M. Califf, the United States Department of Health and Human

Services (HHS), and Xavier Becerra, and alleges as follows:

1

## INTRODUCTION

1.      Gastroparesis is a debilitating chronic digestive disorder. Patients suffering from gastroparesis cannot empty their stomachs of food in a normal fashion. They experience severe distress from eating, including vomiting of food that cannot pass through the stomach. Gastroparesis causes constant and oppressive nausea of a magnitude so severe and recurrent that everyday activities—from working, to spending time with family, to basic travel—become functionally impossible.

2.      Patients with gastroparesis currently have extremely limited therapeutic options. There is only one FDA-approved drug indicated to treat diabetic gastroparesis (and no drugs approved for the idiopathic form of gastroparesis), and this drug can only be used for acute treatment because of serious safety risks associated with prolonged use. Other off-label or "compassionate use" treatment options also carry significant safety risks and have demonstrated limited evidence of efficacy.

3.      Vanda is currently developing tradipitant, a drug that has shown exceptional promise to treat severe nausea in gastroparesis patients. In a four-week clinical trial, participants receiving tradipitant experienced significant improvement in their nausea and other gastroparesis symptoms. The results were even more promising for gastroparesis patients who, in addition to nausea, experienced at least one vomiting episode during the screening period. All of these improvements were statistically significant when compared to the placebo group. These findings were subjected to peer review and published in the Journal of Gastroenterology.

4.      FDA agreed that these results were promising. It explained to Vanda that it "see[s] a potential therapeutic role for tradipitant, particularly for *the short-term relief of nausea* in gastroparesis patients" based upon this study. Accordingly, FDA noted with respect to tradipitant, "the Division is considering an indication for the short-term relief of nausea in gastroparesis." FDA therefore "encourage[d] [Vanda] to further evaluate tradipitant for this use in appropriately designed clinical trials to support … an application for marketing approval." Vanda took this

advice to heart and shaped its development program around this potential indication, investing years of effort and millions of dollars into pursuing this indication.

5.      As part of this plan, while full clinical studies for tradipitant are ongoing, Vanda sought Fast Track designation pursuant to 21 U.S.C. § 356(b). According to that statute, Fast Track designation is intended to "facilitate the development and expedite the review" of certain drugs that have "the potential to address unmet medical needs" for patients with "a serious or life-threatening disease." 21 U.S.C. § 356(b)(1). Consistent with FDA's advice, Vanda sought Fast Track designation for tradipitant's use in the treatment of "*symptoms* of gastroparesis," such as acute nausea relief.

6.      Fast Track designation turns on two key criteria: whether (1) the drug is intended to treat "a serious or life-threatening disease or condition" and (2) "it demonstrates the potential to address unmet medical needs for such a disease or condition." 21 U.S.C. § 356(b)(1). The preliminary and provisional nature of this inquiry makes good sense. Fast Track designation merely requires FDA to facilitate the development of drugs that may serve a crucial public benefit; the designation is not an approval for marketing to the public.

7.      The statute does not provide FDA any discretion. If the two statutory criteria are met, FDA "shall designate the drug as a fast track product and shall take such actions as are appropriate to expedite the development and review of the application for approval of such product." *Id.* § 356(b)(3).

8.      FDA does not dispute that gastroparesis is a "serious or life-threatening disease" within the meaning of Section 356(b)(1). Nor does it dispute that patients with gastroparesis have "unmet medical needs." The agency nevertheless denied Fast Track designation for tradipitant on the view that tradipitant supposedly does not "demonstrate the potential to address an unmet medical need."

9.      Specifically, FDA's one-page denial letter explained that "the lack of necessary safety data" was "inconsistent with the criteria for … Fast Track designation." That was the essential point of FDA's explanation.

10.     Vanda promptly wrote to FDA seeking further explanation for the reasons for its denial. Several months have passed, and FDA has still not provided any clarification or response, notwithstanding FDA's regulatory responsibility to provide guidance to sponsors on specific matters relating to a drug development program. 21 C.F.R. § 312.41(b).

11.     FDA's decision is unlawful and must be set aside for a host of reasons. *First*, it is based on a plainly atextual view that Vanda must frontload its demonstration of satisfying the requirements for *marketing approval* in order to obtain Fast Track designation, rather than demonstrating what the statute actually requires: "the potential" for the drug to address an unmet medical need. 21 U.S.C. § 356(b)(1). Indeed, the very purpose of Fast Track designation is so that FDA can help "*facilitate the development*" of a drug so that it *can later* receive marketing approval. *Id.* (emphasis added). *Second*, FDA arbitrarily treated tradipitant differently than other similar drugs to which it has granted Fast Track designation. The premise of FDA's denial is that Vanda must demonstrate tradipitant can be approved to *chronically* treat the *whole* disease, but FDA has routinely granted Fast Track designation to drugs intended to be used both for *acute* treatments and for a *single* symptom. *Third*, in basing its denial on this flawed premise, FDA inexplicably reversed course on its previous position that it "see[s] a potential therapeutic role for tradipitant … for the short-term relief of nausea in gastroparesis patients," without any explanation. *Fourth*, FDA did not consider significant, relevant evidence before it that demonstrated tradipitant had the potential to provide short-term nausea relief in gastroparesis patients.

12.     Indeed, rather than consider the existing evidence supporting tradipitant's potential to fill the unmet needs of gastroparesis patients—as required by statute—FDA rested its rejection of Vanda's Fast Track application on its own beliefs about what data Vanda may or may not collect as part of its ongoing development program, and whether those data may satisfy the criteria for ultimate marketing approval. But that turns the statute on its head. In keeping with Congress's design, Fast Track designations are granted early in the development process upon a showing only of *potential* to meet an unmet need; this threshold determination is not reserved for drugs that the agency believes will ultimately satisfy the conditions for full approval. And for good reason: in

4

making the threshold Fast Track determination, FDA cannot see into the future to know what the results of an as-yet hypothetical development program would be.

13.     Nor are assumptions about which tests may be conducted in a development program an appropriate basis for a Fast Track denial—nor, indeed, are assumptions about whether the agency itself may modulate its own regulatory positions when faced with additional data. Yet FDA here has based its denial of Fast Track status on exactly these kinds of impermissible speculation, rather than on the one criterion provided by the statute: whether the drug "demonstrates the *potential* to address unmet medical needs." 21 U.S.C. § 356(b)(1).

14.     Patients suffering from gastroparesis are in desperate need of treatments that provide relief from their symptoms so that they can have a semblance of a normal life. FDA should be facilitating the development of drugs, like tradipitant, that have demonstrated the potential to provide this much-needed relief. Indeed, that prioritization of promising drugs for untreated conditions is precisely what the Fast Track designation is designed to achieve. But rather than grant these benefits with regard to tradipitant, FDA has essentially rewritten the statute, using its own speculation about the future probability of approval—an outcome that is many steps removed from a threshold Fast Track designation—to discount tradipitant's demonstrated "potential to address unmet medical needs." 21 U.S.C. § 356(b)(1). An ultimate-approvability criterion, however, is nowhere to be found in the statute. The Court should set aside FDA's denial and remand with further instructions for it to properly consider the evidence within the correct statutory framework.

## PARTIES

15.     Plaintiff Vanda Pharmaceuticals, Inc. is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high-priority unmet medical needs and to improve the lives of patients. Vanda is incorporated in Delaware and maintains its principal place of business in Washington, D.C. Vanda is developing a promising new drug called tradipitant to provide short-term relief for the debilitating nausea symptoms associated with gastroparesis.

16.     Defendant Food and Drug Administration is an agency of the United States government within the Department of Health and Human Services. The Secretary of Health and Human Services has delegated to FDA the authority to administer the relevant provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (FDCA). FDA is headquartered in Silver Spring, Maryland.

17.     Defendant Robert M. Califf, M.D., is Commissioner of Food and Drugs. The Commissioner of Food and Drugs has delegated authority to administer the FDCA. He is sued in his official capacity only.

18.     Defendant United States Department of Health and Human Services is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HHS is headquartered in Washington, D.C.

19.     Defendant Xavier Becerra is Secretary of Health and Human Services. The Secretary of Health and Human Services is the official charged by law with administering the FDCA. He is sued in his official capacity only.

## JURISDICTION AND VENUE

20.     Vanda brings this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

21.     This case arises under the laws of the United States. The court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

22.     Venue is proper in this district under 28 U.S.C. § 1391(e) because at least one defendant resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and plaintiff Vanda resides in this district.

## FACTUAL ALLEGATIONS

### A.     Gastroparesis is a severe, life-altering condition with an urgent need for treatments

23.     Gastroparesis is a serious chronic digestive disorder. *See, e.g.*, FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment: Guidance for Industry (Draft)* 2 (August 2019),

6

https://perma.cc/5W97-3X22 (*Gastroparesis Guidance*). Patients with gastroparesis cannot empty food from their stomachs into the small intestines. After undigested food remains in the stomach for some days, patients will typically vomit that food—in violent fashion—after it ferments (or rots) in the individual's stomach. Patients with the disease suffer from constant nausea and abdominal pain. They often are unable to eat full meals in light of what doctors call "early satiety" and "postprandial fullness." *See, e.g.*, *id.*; Jean Fox & Amy Foxx-Orenstein, *Gastroparesis Overview*, American College of Gastroenterology (June 2021), https://perma.cc/T2TS-89HX.

24.    The estimated prevalence of gastroparesis in the United States is approximately 267.7 per 100,000 persons.



*See* Yizhou Ye, et al., *Epidemiology, Etiology, and Treatment of Gastroparesis: Real-World Evidence From a Large US National Claims Database*, 162 Gastroenterology 109 (2022).

25.    Forms of gastroparesis include idiopathic and diabetic. The symptoms are similar, but patients with idiopathic gastroparesis may experience more frequent pain, and patients with diabetic gastroparesis may experience further difficulty maintaining glucose control. *Gastroparesis Guidance* 2. Gastroparesis also sometimes develops as a surgical complication, which tends to present more short-term symptoms. *See* Nat'l Org. Rare Disorders, *Gastroparesis*, *available at*: https://perma.cc/AA6Z-2TJZ.

26.    Gastroparesis has a substantial impact on the day-to-day functioning of those with the disease. Patients often find that the nausea, discomfort, and pain associated with gastroparesis

interfere with their employment, social lives, and ability to maintain normal eating patterns. Symptom exacerbations frequently lead to hospitalization. In one study of 1423 adult patients, 45.5% reported that they were not working or were working limited hours due to their gastroparesis.[1]

27.    Moreover, gastroparesis tends to be progressive, with symptoms worsening over time as damage to the gastrointestinal system accumulates. While the early stages of the disease are characterized simply by weight loss (along with nausea, vomiting, and stomach pain), the final stages often require a feeding tube and frequent hospitalizations.

28.    FDA itself has recognized the serious nature of gastroparesis—and the unmet need for treatment options. As FDA has explained, "[d]etermining whether a condition is serious … is based on whether the drug will have an impact on such factors as survival, day-to-day functioning, or the likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one." *See* FDA, *Fast Track* (Jan. 4, 2018), perma.cc/E83B-6KYF. Recognizing that gastroparesis is a serious disease and patients have unmet medical needs, FDA has previously approved Fast Track designations for two drugs intended to treat gastroparesis.[2] And in a draft guidance document on gastroparesis, FDA stated "[t]here is an urgent medical need for development of safe and effective therapies to treat patients with gastroparesis." *Gastroparesis Guidance* 2.

29.    There currently are no FDA-approved drugs to treat idiopathic gastroparesis.

30.    There are no long-term pharmacological treatment options for diabetic gastroparesis, either. There is only one FDA-approved drug indicated for the treatment of diabetic

---

[1]    *See* Daohai Yu, et al., *The Burdens, Concerns, and Quality of Life of Patients with Gastroparesis*, 62 Dig. Dis. Sci. 879, 883 (2017).

[2]    *See* Steve Duffy, *Fast Track Designation Granted to Novel Gastroparesis Therapy*, MPR (Dec. 6, 2016), perma.cc/Q552-PTRU (discussing Fast Track designation of velusetrag); Press Release, *Allergan to Acquire GI Disease Subsidiary of Rhythm Holding Company, LLC, Expanding Innovative Gastroenterology Pipeline*, Allergan (Oct. 27, 2016), perma.cc/C2RC-RUH8 (discussing Fast Track designation of relamorelin).

gastroparesis—Reglan—but it is associated with serious adverse reactions that prevent long-term use.

31.    The FDA-approved label for Reglan (metoclopramide) bears a boxed warning—FDA's most serious warning—regarding the risk of developing tardive dyskinesia (TD), a serious movement disorder that is untreatable and often irreversible. *See* Reglan (metoclopramide) Label at 2, perma.cc/4W7L-3P62. The warning recommends avoiding treatment for longer than 12 weeks because of the risk of developing TD with longer-term use. Reglan is also subject to a Risk Evaluation and Mitigation Strategy (REMS) requiring that a guide for patients be distributed with the drug.[3] A REMS is necessary when a particular risk or risks associated with a medication may outweigh its benefits and additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks.[4] Reglan's approval was based on trials conducted over three decades ago.

32.    Domperidone is another possible treatment option. It is not FDA-approved, but it is potentially available pursuant to an expanded access (or "compassionate use") investigational new drug application.[5] Domperidone, however, is associated with serious cardiovascular risks, including sudden cardiac death. *See* FDA, *How to Request Domperidone for Expanded Access Use*, perma.cc/SNJ2-MWA7.

---

[3]    FDA, *Reglan Highlights of Prescribing Information* (2017), perma.cc/VZ2U-WQZN; Letter from Joyce Korvick, FDA, to Mary Alonso, Alaven Pharm. (Sept. 4, 2009), perma.cc/M8UC-MZ9S.

[4]    FDA, *Frequently Asked Questions (FAQs) about REMS*, perma.cc/NPU8-FXYH.

[5]    *See* FDA, *The Voice of the Patient: Functional Gastrointestinal Disorders* 10 (Jan. 2016), perma.cc/LE2G-HDF6; *see also* Fox & Foxx-Orenstein, *supra*.

33.     Erythromycin, an antibiotic and prokinetic, is not approved for treatment of gastroparesis, but is sometimes used off-label to treat the disease. Erythromycin generally loses its effectiveness against gastroparesis symptoms after a few weeks of treatment.[6]

34.     Each available treatment option therefore comes with either serious safety risks, little benefit, or both.

35.     Gastroparesis is thus a serious disease with no adequate available therapy for treatment. There are no FDA-approved treatments for idiopathic gastroparesis whatsoever, and the only approved treatment option for diabetic gastroparesis carries the most serious FDA warning available.

36.     FDA has recognized that nausea is a core symptom of gastroparesis. In its 2019 guidance, FDA noted that nausea is the most commonly reported symptom, with 92 to 96 percent of patients reporting it. *Gastroparesis Guidance* 2.

37.     In January 2016, FDA's Center for Drug Evaluation and Research (CDER) published a report, "The Voice of the Patient, Functional Gastrointestinal Disorders," stemming from a public meeting held on May 11, 2015.[7] Under the heading "[p]erspective on most significant symptoms," FDA identified (among others) "Nausea and Vomiting":

> In a polling question (Appendix 3, Q7), two-thirds of in-person and web participants identified nausea and vomiting as significant signs and symptoms that impacted their daily life. Many participants described living with chronic nausea, which as one participant explained is like "being seasick all the time." Some participants described persistent and debilitating vomiting; in one example, one participant described vomiting 20 to 30 times per day in the early stage of her disease. A few participants acknowledged that as their disease progressed, they "managed to get a handle" or decrease the number of times they vomited daily, but that the nausea remained constant. Participants also shared the resulting impacts of

---

[6]     *See* Hasse Abrahamsson, *Treatment Options for Patients with Severe Gastroparesis*, 56 Gut 877, 878 (2007), perma.cc/END7-4M4T; *see also* Fox & Foxx-Orenstein, *supra*.

[7]     perma.cc/LE2G-HDF6.

persistent nausea and vomiting; these included pain, inability to eat a full meal, and inability to concentrate.[8]

38.     There is significant—and unmet—patient demand for a therapy to treat nausea associated with gastroparesis. As the International Foundation for Gastrointestinal Disorders (IFFGD) explained to FDA in recent comments on draft guidance, "[r]elieving even just one symptom in patients suffering from gastroparesis can make a significant difference in an individual's quality of life." IFFGD, *Comments to Draft Guidance* at 2 (Oct. 15, 2019), https://www.regulations.gov/document?D=FDA-2015-D-2479-0014.

39.     The Gastroparesis Clinical Research Consortium has concluded that an improvement in nausea alone should be a sufficient endpoint for drug approval:

> Some patients suffer from severe nausea and for behavioral or physiological reasons do not vomit. The GpCRC studies have clearly shown that nausea, independent of vomiting, remains the most debilitating symptom and one that interferes the most with quality of life. Currently, apart from metoclopramide, there are no anti-nauseants that are approved for patients with gastroparesis. These patients have to resort to using drugs on an off-label basis- these are either expensive and denied by their insurance carriers (such as 5-HT3 antagonists) or are non-specific and associated with sedation, dependency or other neurological effects (such as phenothiazines or antihistamines). Further, the different symptoms of gastroparesis probably stem from distinct pathophysiologies and there is no scientific basis to believe that targeting any one pathway will benefit others. In the absence of disease-modifying approaches, the least we can do is offer symptomatic relief and arbitrarily raising the bar so as to exclude drugs that address the most important and debilitating symptom of gastroparesis (nausea) will not be in the best interests of our patients.[9]

40.     In its 2016 Voice of the Patient Report, FDA noted that in comments submitted regarding "ideal treatments for functional GI disorders," "[c]ommenters identified the need for medications that addressed *specific symptoms*, including reducing nausea and increasing the ability to eat."[10]

---

[8]     *Id*. at 6-7.

[9]     Gastroparesis Clinical Research Consortium, *Comments on FDA Draft Guidance*, at 1-2 (Sept. 23, 2019), https://www.regulations.gov/document?D=FDA-2015-D-2479-0013.

[10]     *Voice of the Patient*, *supra*, at 13-14.

41.     FDA's gastroparesis guidance thus recommends researchers home in on a "subset" of the disease's symptoms in early phase trials "based on which signs or symptoms the treatment is likely to improve." *Gastroparesis Guidance* 3. And the guidance recognizes that approvable drugs may be "intended to treat only a subset of the core signs or symptoms, based on the mechanism of the drug"—so long as they "do not worsen the remaining signs or symptoms of gastroparesis." *Id.*

### B.     The Drug Development Process

42.     The pharmaceutical research and development process involves several steps. Because of the many steps involved, estimates suggest that it typically takes $2.6 billion and "at least ten years for a new medicine to complete the journey from initial discovery to the marketplace." *Id.* at 1.

43.     Under the Food, Drug, and Cosmetic Act (FDCA), a new drug may not be introduced into interstate commerce without FDA approval. *See* 21 U.S.C. §§ 355(a), 331(d).

44.     The FDCA requires FDA to create, by regulation, an exception to this prohibition for new drugs that are used solely in clinical trials "to investigate the[ir] safety and effectiveness." 21 U.S.C. § 355(i)(1).

45.     The FDA regulations implementing 21 U.S.C. § 355(i) require the sponsor of a new drug to submit an Investigational New Drug application (IND) before clinical trials in the United States may begin. *See* 21 C.F.R. § 312.20. Among other things, an IND must contain information on the drug's chemistry and manufacturing, information on the pharmacological and toxicological effects of the drug from animal studies and in vitro testing, information on any previous human experience, and a protocol for each planned study. *See id.* § 312.23.

46.     An IND automatically becomes active 30 days after it is submitted to FDA, unless FDA imposes a "clinical hold," which prevents further study. 21 U.S.C. § 355(i)(2), (3).

47.     Once an IND is active, clinical trials generally are conducted in three phases. *See* 21 C.F.R. § 312.21.

12

48.     Phase I involves the initial introduction of a new drug into human subjects; it may be conducted in patients or healthy volunteer subjects; and it is "designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." 21 C.F.R. § 312.21(a)(1).

49.     Phase II studies are "typically well controlled, closely monitored, and conducted in a relatively small number of patients" and are used to evaluate "effectiveness of the drug for a particular indication … and to determine the common short-term side effects and risks associated with the drug." 21 C.F.R. § 312.21(b).

50.     Phase III studies are expanded trials, designed to "gather … additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c).

51.     Industry estimates conclude that of the ten-year development cycle, "clinical trials alone tak[e] six to seven years on average" to complete. *See* Biopharmaceutical Research & Development: The Process Behind New Medicines, PhRMA at 1 (2015), perma.cc/PL5Y-YW7P.

**C.     Tradipitant has shown promise in treating gastroparesis symptoms**

52.     Tradipitant is a drug that is a neurokinin 1 receptor antagonist. Blocking this receptor may increase gastric motility and inhibit signaling of brain regions that trigger nausea and vomiting. Vanda has been studying the efficacy of tradipitant in treating gastroparesis under an IND.

53.     After years of preclinical study and phase 1 trials, on April 15, 2019, Vanda released its Clinical Study Report for a phase 2 clinical trial evaluating tradipitant's treatment effect in gastroparesis patients ("phase 2 trial"). As explained in Vanda's application for Fast Track designation, the Clinical Study Report demonstrated that tradipitant showed promise in treating nausea and other symptoms of gastroparesis. The Report found that significantly more patients treated with tradipitant experienced clinically meaningful improvements than patients receiving

placebo. These findings and measures of clinical meaningfulness were confirmed and published in a peer-review medical journal. Jesse L. Carlin, et al., *Efficacy and Safety of Tradipitant in Patients with Diabetic and Idiopathic Gastroparesis in a Randomized, Placebo-Controlled Trial*, 160 Gastroenterology 76 (2021), *available at*: https://www.gastrojournal.org/action/showPdf?pii=S0016-5085%2820%2934958-1.

54.    The phase 2 trial studied the use of a twice-daily dose of tradipitant in 152 patients with either idiopathic or diabetic gastroparesis in a double-blind, placebo-controlled study. Participants received either tradipitant or a placebo for four weeks. All patients participating in the study demonstrated delayed gastric emptying and an average baseline nausea score of moderate to severe at the screening stage. During each day of the study, patients rated their symptoms (such as nausea, abdominal pain, etc.) on a 0 (none) to 5 (very severe) scale and tracked their frequency of vomiting. Prior to receiving treatment, 100% of patients in the study experienced nausea symptoms, with an average score of 3.1 and 3.2 in the treatment and control groups, respectively.

55.    The primary endpoint evaluated in the phase 2 trial was the nausea severity score. At week 4, average nausea severity scores for the treatment- and placebo-groups decreased 1.25 and 0.73, respectively. The improvement in the treatment group was statistically significant compared to the improvement seen in the placebo group.

56.    Tradipitant also demonstrated a statistically significant effect on the related endpoint of the number of nausea-free days. Patients receiving tradipitant experienced a 28.8% increase in nausea-free days, compared to a 15.0% increase for patients receiving the placebo.

57.    Moreover, over four weeks of treatment, 32.9% of patients receiving tradipitant improved their average nausea score to ≤ 1 (very mild nausea) compared to only 11.8% of patients on placebo achieving this level of improvement. And 15.1% of patients treated with tradipitant had an average nausea score of 0 (no nausea) for the entire week four compared to only 4.4% of patients on placebo. These differences too were statistically significant.

58.    The results were even more promising for gastroparesis patients who, in addition to nausea, experienced at least one vomiting episode during the screening period. Vanda refers to

this subgroup of patients as the Baseline Vomiting subgroup. The Baseline Vomiting subgroup achieved final average nausea severity scores of 1.43, experiencing a 1.72 decrease in average nausea severity scores over the course of the trial, compared to just a 0.42 decrease in the placebo group. And 36.2% of patients receiving tradipitant had a final average nausea score ≤ 1, compared to just 7% of the placebo group. Tradipitant thus produced even stronger results for gastroparesis patients who entered the trial with the vomiting symptom.

59. Tradipitant had a similar effect between patients with either idiopathic or diabetic gastroparesis. The two groups receiving tradipitant experienced a decrease in nausea severity score of 1.28 and 1.12, respectively, compared to a 0.73 and 0.85 improvement in the placebo groups. The improvement on tradipitant compared to the placebo group was statistically significant for the idiopathic gastroparesis group, but not the diabetic gastroparesis group due to the small sample size.

60. The results were consistent across patients who used and did not use rescue medications during the study. Both groups experienced significant improvements in average daily nausea and nausea-free days compared to placebo.

61. Study participants also showed improvements in holistic gastroparesis symptoms while taking tradipitant. In addition to nausea, the study evaluated the Gastroparesis Cardinal Symptom Index, the Patient Assessment of Gastrointestinal Disorders—Symptom Severity Index, the Clinical Global Impression of Severity, and the Patient Global Impression of Change. The results all showed statistically significant improvements with tradipitant, again, with an even greater effect in the Baseline Vomiting subgroup:



**Figure 2:** Forest Plot of Change from Baseline to Week 4 in VP-VLY-686-2301 Study Endpoints in the Intent-to-Treat Population

CGI-S = Clinician Global Impression of Severity; DIFF = Difference; GCSI = Gastroparesis Cardinal Symptom Index; ITT = Intent-to-Treat; Lower = Lower Confidence Limit; PAGI-SYM = Patient Assessment of Gastrointestinal Disorders – Symptom Severity Index; PGI-C = Patient Global Impression of Change; Upper = Upper Confidence Limit.
Sources: Post-text Tables 14.2.1.1, 14.2.3.1, 14.2.3.5, 14.2.3.7, and 14.2.3.12

**Figure 3:** Forest Plot of Change from Baseline to Week 4 in VP-VLY-686-2301 Study Endpoints in Baseline Vomiting Group

CGI-S = Clinician Global Impression of Severity; DIFF = Difference; GCSI = Gastroparesis Cardinal Symptom Index; Lower = Lower Confidence Limit; PAGI-SYM = Patient Assessment of Gastrointestinal Disorders – Symptom Severity Index; PGI-C = Patient Global Impression of Change; Upper = Upper Confidence Limit.
Sources: Post-text Tables 14.2.1.1a, 14.2.3.1a, 14.2.3.5a, 14.2.3.7a, and 14.2.3.12a.

### D. Tradipitant has demonstrated a robust safety profile

62. Tradipitant has been studied extensively in animals and humans for multiple indications, beginning in 2003. No relevant human safety signals have emerged.

63. Tradipitant was studied in 14 preclinical studies in both rodent and non-rodent species, in a total of 3,669 animals. Some of these studies were toxicity studies, which attempted

16

to discover the level of drug concentration within the body at which adverse health effects emerge. The findings from these studies—which involved dosing of the drug at concentrations many times higher than would ever be used in humans—did not evidence any clinical, laboratory, or pathology evidence of target organ toxicity at doses ranging from 15mg/kg to 1500mg/kg. Even at the highest dose administered (an 85-fold human equivalent dose in rats and 294-fold human equivalent dose in dogs), no observed adverse effect level was achieved. Similarly, tradipitant was not shown to be teratogenic in animal testing even at exceedingly high dose levels beyond what humans would take.

64.     Vanda conducted a 3-month repeated-dose study in dogs with doses up to 1500mg/kg/day. No relevant safety observations emerged.

65.     The maximum dose used in the phase 2 trial in humans was about 3mg/kg/day.

66.     Tradipitant has proven to be safe and well-tolerated in humans. Over the course of ten phase 1 studies and seven phase 2 studies, 982 patients took tradipitant. The drug has shown a favorable tolerability profile, with the most common side effects (in less than 10% of the population) being fatigue and sleepiness. No significant safety findings were reported in these trials.

67.     No safety concerns emerged in a recent phase 3 trial, which studied over 400 patients over a 12-week period.

68.     No evidence has emerged that tradipitant increases the risk of tardive dyskinesia, the risk for which Reglan—the only approved treatment for diabetic gastroparesis—bears a boxed warning.

69.     Notwithstanding the lack of safety concerns that have emerged in both human and animal toxicity studies to date, in December 2018, FDA imposed a partial clinical hold on tradipitant, preventing Vanda from studying tradipitant in humans for longer than 3 months until it conducted a 9-month toxicity study in nonrodent animals (dogs, monkeys, or minipigs). FDA's position is that a longer-term toxicity study in nonrodent animals must be conducted before longer-term use of tradipitant can be tested in humans.

70.     Vanda declined to conduct such a study. Long-term toxicity studies always conclude in the killing of the test-subject dogs, typically young beagles. And it would have diverted Vanda's limited resources from drug research and development efforts to unhelpful animal tests.

71.     Instead, at the advice of FDA itself, Vanda decided to focus on securing approval for a short-term indication for the treatment of gastroparesis symptoms.

**E.      Fast Track designation statutory framework**

72.     Recognizing the prolonged length of the drug-development process, in 1997, Congress passed the Food and Drug Administration Modernization Act of 1997 (FDAMA), Pub. L. No. 105-115, 111 Stat. 2295, a goal of which was to improve expedited access to new drugs for individuals with serious illnesses. Congress sought to authorize broader application of the expedited development and approval processes then available for patients with HIV/AIDS and cancer to patients with other serious diseases and conditions. It thus added a new program for expedited development and review: the Fast Track designation. *See* 21 U.S.C. § 356(b).

73.     A drug sponsor may request Fast Track designation "concurrently with, or at any time after, the submission" of an investigational new drug application. *Id.* § 356(b)(2).

74.     Section 356(b)(1) provides, in particular, that:

> The Secretary shall, at the request of the sponsor of a new drug, facilitate the development and expedite the review of such drug if it is intended, whether alone or in combination with one or more other drugs, for the treatment of a serious or life-threatening disease or condition, and it demonstrates the potential to address unmet medical needs for such a disease or condition.

21 U.S.C. § 356(b)(1). Thus, Fast Track designation turns on two key criteria: (1) whether the drug is intended to treat a serious or life-threatening disease and (2) whether it demonstrates the potential to address unmet medical needs for such a disease or condition. *Id.*

75.     Fast Track designation is non-discretionary. "[T]he Secretary shall designate the drug as a fast track product" so long as those two elements are met. *Id.* § 356(b)(3).

76.     In 2012, Congress again noted the importance of expedited approval processes in enacting the Food and Drug Administration Safety and Innovation Act (FDASIA), Pub. L. No.

112-144, 126 Stat. 993. Congress found that "[p]atients benefit from expedited access to safe and effective innovative therapies to treat unmet medical needs for serious or life-threatening diseases." *Id.* § 901(a)(1)(D). And Congress found that "advances in medical sciences" have produced "[a] new generation of modern, targeted medicines … to treat serious and life-threatening diseases" that are being developed using innovative techniques "based on biomarkers or pharmacogenomics, predictive toxicology, clinical trial enrichment techniques, and novel clinical trial designs." *Id.* § 901(a)(1)(B). In light of scientific advancements and demonstrated patient benefits, Congress found that "FDA should be encouraged to implement more broadly effective processes for the expedited development and review of innovative new medicines intended to address unmet medical needs for serious or life-threatening diseases or conditions." *See id.* § 901(a)(1)(C).

77.     Congress reiterated its intent in FDASIA "that the Food and Drug Administration should apply the … fast track provisions … to help expedite the development and availability to patients of treatment for serious or life-threatening diseases or conditions." *Id.* § 901(a)(2).

78.     FDA guidance documents acknowledge that the type of information needed to demonstrate the potential of a drug to address an unmet medical need depends on the stage of drug development at which Fast Track designation is requested. "Early in development, evidence of activity in a nonclinical model, a mechanistic rationale, or pharmacologic data could be used to demonstrate such potential. Later in development, available clinical data should demonstrate the potential to address an unmet medical need." *Guidance for Industry: Expedited Programs for Serious Conditions—Drugs and Biologics*, FDA 9 (May 2014), perma.cc/K89B-QD6H ("*Expedited Programs Guidance*"). The Guidance does not describe additional safety and efficacy data requirements, nor does it specify which unmet medical needs must be addressed.

79.     Once a drug receives Fast Track designation, the statute requires FDA to take actions to "expedite the development and review" of the application for approval of such product. 21 U.S.C. § 356(b)(3).

80.     According to the *Expedited Programs Guidance*, these actions include:

1) Frequent interactions with the review team;

2) Meetings with FDA, including pre-IND meetings, end-of-phase 1 meetings, and end-of-phase 2 meetings to discuss study design, extent of safety data required to support approval, dose-response concerns, and use of biomarkers;

3) Other meetings scheduled as appropriate (e.g., to discuss accelerated approval, the structure and content of an NDA, and other critical issues).

*Id.* at 9.

81.     As the statutory language and history make clear, Congress enacted Fast Track designation to identify drugs that have the potential to treat unmet medical needs for serious diseases and facilitate their development to shorten considerably the timeline to bring those drugs to market.

**F.      Vanda submits a request for Fast Track designation after FDA explains it was considering tradipitant for an indication for the short-term relief of nausea in gastroparesis patients**

82.     On March 28, 2019, Vanda submitted a request for Breakthrough Therapy designation for tradipitant. Breakthrough Therapy designation is another expedited pathway which expedites the development and review of drugs that are intended "to treat a serious or life-threatening disease or condition" and that have demonstrated "substantial improvement over existing therapies" in "preliminary clinical evidence." 21 U.S.C. § 356(a)(1). The requirements for Breakthrough Therapy designation are thus more stringent than the requirements for Fast Track designation.

83.     FDA denied the request on May 31, 2019, despite acknowledging that gastroparesis is "a serious or life-threatening disease or condition."

84.     At FDA's suggestion, Vanda submitted a second request for Breakthrough Therapy designation with additional data. After that request was denied, Vanda appealed through Formal Dispute Resolution. *See* 21 C.F.R. § 10.75.

85.     Although FDA denied the request for Breakthrough Therapy designation for tradipitant for "the treatment of gastroparesis," the agency explained that it was "considering an indication for the short-term relief of nausea in gastroparesis." FDA "see[s] a potential therapeutic role for tradipitant, particularly for the short-term relief of nausea in gastroparesis patients."

86.     FDA suggested a path forward. It explained, "FDA and Vanda agree on the need for new safe and effective treatments for patients with gastroparesis, a serious medical condition with significant morbidity." FDA therefore "encourage[d] [Vanda] to further evaluate tradipitant for this use in appropriately designed clinical trials to support … an application for marketing approval."

87.     Vanda relied on FDA's position and tailored its tradipitant development program accordingly.

88.     Given FDA's position that there is "a potential therapeutic role for tradipitant" in "short-term relief of nausea in gastroparesis patients," and FDA's partial clinical hold on studying tradipitant for longer than three months in humans, Vanda decided to pursue an indication for the short-term relief of gastroparesis symptoms, such as nausea, while it challenged the partial clinical hold.

89.     Vanda followed the suggestions of FDA in tailoring its development program to gather the necessary data to support ultimate approval for this indication. It designed and conducted a phase 3 study with "a sufficiently symptomatic gastroparesis population … treated for at least 12 weeks" to study the effect of tradipitant on nausea and other gastroparesis symptoms. Vanda invested substantial time and financial resources to conduct this study. The trial recently concluded, several years after Vanda initiated its design, and analysis of its results is ongoing.

90.     Rather than wait for further clinical data to resubmit a Breakthrough Therapy designation request, Vanda instead decided to submit a request for Fast Track designation. After all, FDA had already admitted that tradipitant has "a potential therapeutic role … particularly for the short-term relief of nausea in gastroparesis patients." *Accord* 21 U.S.C. § 356(b)(1) (requiring Fast Track designation when a drug demonstrates "the potential to address unmet medical needs").

21

### G.   FDA denies Vanda's request for Fast Track designation

#### 1.   FDA provided an untimely denial with hardly any reasoning

91.   Vanda submitted a request for Fast Track designation for tradipitant on October 6, 2021. The request thoroughly analyzed and summarized the phase 2 trial, which provided the basis for FDA's position that tradipitant has "a potential therapeutic role" in treating short-term nausea in gastroparesis patients. The request also explained the critical need for therapeutic options for patients suffering from gastroparesis, and tradipitant's well-demonstrated safety profile.

92.   FDA acknowledged the request on October 20, 2021, noting it would respond within 60 days of the request, as required by law. *See* 21 U.S.C. § 356(b)(3).

93.   After waiting over three months without receiving any response, Vanda requested an update on its request in January 2022.

94.   On February 1, 2022, after nearly twice the statutorily mandated timeframe for a decision, FDA denied Fast Track designation for tradipitant in a single-page letter. FDA predicted that, based on the current tradipitant development plan as FDA understood it, Vanda might not be able to obtain safety and efficacy data to achieve marketing approval.

95.   In so holding, FDA did not engage in any analysis of the phase 2 trial data Vanda used to support its Fast Track request. It did not explain why this data did not support a finding that tradipitant has the potential to provide short-term nausea relief in gastroparesis patients. Instead, FDA apparently determined tradipitant did not have the requisite "potential" based on its own speculation as to data Vanda will gather in the future. 21 U.S.C. § 356(b)(1).

96.   FDA has never instructed that there is one mandatory development pathway for gathering the requisite evidence to support approval of a drug indicated to treat gastroparesis. In its draft guidance, FDA only makes "[n]onbinding [r]ecommendations" as to trial design and endpoints. *See Gastroparesis Guidance*. And FDA has never communicated any requirements for approval to Vanda; it has only made suggestions, which Vanda has followed, as to how it should conduct future trials.

97.     Shortly after receiving the denial, Vanda wrote FDA for clarification of the agency's vague reasoning and sparse explanation for its denial. Specifically, Vanda sought further explanation as to whether FDA considered an indication for acute nausea relief, whether FDA agreed that such treatment is an unmet medical need for patients with gastroparesis, and whether it had changed its position that the phase 2 trial demonstrated that tradipitant has a "potential therapeutic role," and if so, why.

98.     Although three months have passed, FDA has still not responded to Vanda's letter or provided any other clarification, notwithstanding its regulatory responsibility to engage with sponsors on INDs. *See* 21 C.F.R. § 312.41(b) ("On the sponsor's request, FDA will provide advice on specific matters relating to an IND."). As a result, Vanda is left without any guidance as to how it should proceed in its development program, all while gastroparesis patients needlessly wait for a treatment option.

### 2.     FDA did not apply the correct statutory standard

99.     FDA denied Fast Track designation because it concluded that Vanda's development plan might not ultimately lead to the data necessary to demonstrate the safety and efficacy of tradipitant, and FDA thus concluded that it would be "inconsistent with the criteria for and purpose of Fast Track designation" to grant it.

100.     To receive ultimate marketing approval for a drug, a drug sponsor must demonstrate, among other things, that the drug is safe for use and that there is "substantial evidence that the drug will have the effect it purports or is represented to have." 21 U.S.C. § 355(d).

101.     The statutory criteria for Fast Track designation do not require the applicant to submit evidence that would establish entitlement to ultimate marketing approval. Nor do the criteria require an adequate "development plan" to obtain such data. *See* 21 U.S.C. § 356(b)(1). Rather, Section 356(b) asks only whether the drug has *the potential* to address *an unmet medical need* in a serious condition. In other words, the pertinent question is whether there is some likelihood that the drug could eventually be used to treat an unmet need of patients with the serious condition.

102.    Accordingly, Fast Track designation does not require the evidence of safety and efficacy necessary to obtain marketing approval, nor does it require evidence to support approval to chronically treat the condition as a whole.

103.    FDA's denial defies the text of Section 356(b) by distorting the criteria for Fast Track designation and essentially frontloading the requirements for marketing approval. Rather than assess whether there is some likelihood, based on existing data, that tradipitant could be used to treat patients with gastroparesis, FDA instead speculated that Vanda was unlikely to satisfy its demands for future approval. But FDA cannot impose additional obligations that require the sponsor to provide safety and efficacy data to support marketing approval at this preliminary stage, nor can it require the sponsor to have already designed studies that will establish its entitlement to marketing approval. And in any event, FDA has never even imposed mandatory requirements (such as a long-term indication, or more than one study finding statistical significance of efficacy) for approval of a drug treating gastroparesis.

104.    FDA's denial nowhere explains why the purported defects it identifies in Vanda's development plan means that tradipitant does not have *the potential* to treat short-term nausea in gastroparesis patients. In essence, FDA concluded tradipitant lacked the requisite "potential," not because of deficiencies in existing data (indeed, it did not analyze this issue at all), but because of speculation that in the future Vanda will not be able to produce sufficient data. This reasoning defies logic.

105.    By resisting the text of Section 356(b), FDA also undermines the statute's purpose. Congress designed Fast Track designation "to *facilitate* the *development*" of the drug, in the hopes that its review can be expedited. 21 U.S.C. § 356(b)(1) (emphasis added). Granting Fast Track designation allows FDA to coordinate with the sponsor to ensure appropriate trials are designed and relevant data collected for speedy and efficient development and review. By prejudging Vanda's development plan and prognosticating on its ultimate approval odds, FDA failed to facilitate the development of a drug that could provide much needed relief for patients in desperate need of treatment options. Congress wanted to identify drugs like tradipitant so their

"development" could be "facilitate[d]," not so they could be subjected to approval requirements as a threshold matter. *Id.*

### 3.    FDA treated tradipitant differently than similarly situated therapies

106.    FDA has previously granted Fast Track designation for other potential gastroparesis treatments, consistent with the appropriate statutory framework and notwithstanding their ultimate development failures.

107.    For example, FDA granted Fast Track designation for drugs at an even earlier stage of development than tradipitant (e.g. TZP-102, *see* Jeff Drew, *FDA Gives Tranzyme Drug Fast-Track Status*, Triangle Business Journal (July 27, 2009), https://perma.cc/2H9P-Q45X), including some that *failed* their primary endpoint in clinical trials (e.g. relamorelin). *See* BioSpace, *Allergan Expands PLEDGE Clinical Research Program in Diabetic Gastroparesis* (May 17, 2019), https://perma.cc/2V3P-YEPP; Michael Camilleri, et al., *Efficacy and Safety of Relamorelin in Diabetics with Symptoms of Gastroparesis: A Randomized, Placebo-Controlled Study*, 153 Gastroenterology 1240 (2017), https://perma.cc/CV6W-FDJU (finding no statistically significant difference between treatment group's improvement and placebo group's improvement in vomiting frequency, the primary endpoint).

108.    This historical practice confirms what the statute already compels: the criteria for marketing approval have no place in Fast Track determinations. FDA's differential treatment of tradipitant compared to these other therapies, in imposing heightened extra-statutory requirements for Fast Track designation for tradipitant, was arbitrary and capricious. *See, e.g.*, *Burlington Northern and Santa Fe R.R. Co. v. Surface Transportation Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("An agency must provide an adequate explanation to justify treating similarly situated parties differently.").

109.    FDA denied Vanda Fast Track designation for tradipitant in part because "a partial clinical hold" may prevent Vanda from gathering the "safety data" for the chronic use of tradipitant. But Vanda's Fast Track request did not state it was pursuing an indication for long-term use of tradipitant. Vanda demonstrated in its Fast Track request that tradipitant had a

statistically significant effect on relieving debilitating nausea in patients with gastroparesis over a four-week timeframe. And no safety concerns emerged with taking tradipitant over this length of time; indeed, the clinical hold is only for use *over three months*.

110.    FDA necessarily reasoned that tradipitant could only receive Fast Track designation for the *chronic* treatment of gastroparesis. Otherwise, FDA's statement referring to the partial clinical hold as preventing the necessary safety data for Fast Track designation has no relevance.

111.    FDA has not required other Fast Track applicants to demonstrate a drug has the potential to chronically treat a disease.

112.    Indeed, FDA has previously granted Fast Track designation to drugs intended to provide acute benefits and for drugs intended to treat only a single symptom of a disease or condition. For example, Emend (aprepitant) is indicated to treat "acute and delayed nausea and vomiting associated with initial and repeat courses" of cancer chemotherapy, and it received Fast Track designation notwithstanding its acute indication and even though chemotherapy produces other symptoms. FDA, Center for Drug Evaluation and Research, *Application Number: 207865Orig1s000 Medical Review* at 27, https://perma.cc/UL39-CNJE (noting Fast Track designation was granted within four days of the sponsor's request for this indication).

113.    FDA has granted final approval for many drugs that treat only a single symptom of a disease or condition, evidencing that treating a single symptom may still fill an unmet medical need in a particular disease or condition. Some of these drugs received Fast Track designation. Examples include:

- Abilify (aripiprazole) and Risperdal (risperidone) are indicated to treat irritability associated with autistic disorder. That disorder has other core signs and symptoms.

- Adasuve (loxapine) and Geodon (ziprasidone) are indicated to treat agitation associated with schizophrenia or bipolar disorder in adults and acute agitation in schizophrenic patients, respectively. Those diseases have additional core signs and symptoms.

- Apokyn (apomorphine) is indicated to treat acute, intermittent hypomobility episodes associated with patients with advanced Parkinson's disease. That

disease has other core signs and symptoms. The drug received Fast Track designation.

- Austedo (deuterabenazine) is indicated to treat chorea associated with Huntington's disease, although the disease has additional core signs and symptoms.

- Clozaril (clozapine) is indicated to reduce suicidal behavior in patients with schizophrenia or schizoaffective disorder. That disorder has other core signs and symptoms.

- Nuvigil (armodafinil) and Provigil (modafinil) are indicated to treat excessive sleepiness associated with obstructive sleep apnea (OSA), narcolepsy, or shift work disorder (SWD). Those disorders have other core signs and symptoms.

- Otezla (apremilast) is indicated to treat oral ulcers associated with Behcet's Disease. That disease has other core signs and symptoms.

- Pertzye (pancrelipase) is indicated to treat exocrine pancreatic insufficiency in adults due to cystic fibrosis or other conditions. Cystic fibrosis has other core signs and symptoms. The drug received Fast Track designation.

- Sunosi (solriamfetol) is indicated to treat excessive daytime sleepiness associated with narcolepsy or obstructive sleep apnea. Those conditions have other core signs and symptoms.

- Xyrem (sodium oxybate) is indicated to treat cataplexy or excessive daytime sleepiness (EDS) in patients 7 years of age and older with narcolepsy. That condition has other core signs and symptoms.

114.    Again, "[a]n agency must provide an adequate explanation to justify treating similarly situated parties differently." *Burlington Northern*, 403 F.3d at 776. FDA's failure to explain why tradipitant could not receive Fast Track designation for the short-term relief of nausea associated with gastroparesis, considering FDA's treatment of other similarly situated therapies, was "arbitrary and capricious." *Id.* at 777.

### 4.    FDA did not explain its change in position

115.    FDA has acknowledged at various points in time that both elements for Fast Track designation are satisfied with respect to tradipitant. It does not dispute that gastroparesis is a serious disease and patients with gastroparesis have unmet medical needs. And it previously acknowledged that tradipitant has the potential to address some of those unmet medical needs.

27

116.     FDA previously maintained the position that it "see[s] a potential therapeutic role for tradipitant, particularly for the short-term relief of nausea in gastroparesis patients." In other words, FDA's position was that tradipitant has the "*potential* to address unmet medical needs" of patients with gastroparesis. 21 U.S.C. § 356(b)(1) (emphasis added).

117.     FDA has also reviewed and approved more than a dozen Expanded Access requests for tradipitant in gastroparesis patients. Congress created the Expanded Access program to allow patients suffering from serious medical conditions, who cannot afford to wait years for drug approval, to have early access to potentially life-changing medication when they lack approved treatment options. Under the statute, if "there is sufficient evidence of safety and effectiveness to support" a provider's recommendation for these patients, drugs still in an investigational stage may be provided where "no comparable or satisfactory alternative therapy" exists. 21 U.S.C. § 360bbb(b)(2); *see also* 21 C.F.R. § 312.305(a). FDA's approval of Expanded Access requests for tradipitant confirms the agency's position that the drug has "sufficient evidence of safety and effectiveness" to support a finding that the drug at least has the "potential" to treat symptoms of gastroparesis in at least some patients. *Compare* 21 U.S.C. § 360bbb(b)(2), *with id.* § 356(b)(1).

118.     Additionally, FDA had explained to Vanda that it was "considering an indication for the short-term relief of nausea in gastroparesis" for tradipitant. In turn, it advised Vanda "to further evaluate tradipitant for this use in appropriately designed clinical trials to support … an application for marketing approval."

119.     FDA has never promulgated a regulation or published binding guidance requiring safety data exceeding three months as a condition to approve a drug indicated for gastroparesis. In fact, there is currently no drug indicated for gastroparesis for longer than three months.

120.     In denying Fast Track designation to tradipitant, however, FDA reversed course in these positions.

121.     First, the agency denied Fast Track designation notwithstanding its previous position that it saw "a potential therapeutic role for tradipitant" and its grant of Expanded Access use to several patients.

28

122.    Second, by relying on the absence of safety data supporting chronic use, FDA necessarily considered the use of tradipitant for only the treatment of chronic gastroparesis itself, contrary to its previous position that it was considering an indication for *short-term* relief of *nausea* in patients with gastroparesis.

123.    FDA therefore flip-flopped in its position on tradipitant on multiple scores, without any explanation.

124.    "[A]n agency changing its course . . . [must] supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). At the very least, the APA "demand[s] that [the agency] display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis added). It is arbitrary and capricious to "depart from a prior policy *sub silentio*." *Id.*

125.    That is especially true where, as here, there are "serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515. Vanda relied on FDA's position and its explicit recommendation to tailor its development program "to further evaluate tradipitant for [short-term relief of nausea in gastroparesis patients]." Vanda developed a Fast Track application around this indication, yet FDA failed to even acknowledge its change in position in denying Fast Track designation.

126.    FDA's failure to explain or even acknowledge its change in position is an independent reason to set aside its action.

## CLAIMS FOR RELIEF

### Count I
### Arbitrary and Capricious Agency Action
### (use of improper standard)

127.    Vanda incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

128.    "Federal agencies are creatures of statute. They possess only those powers that Congress confers upon them. If no statute confers authority to a federal agency, it has none. If

Congress has forbidden an agency from taking an action, the agency cannot so act." *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021). Thus, agency action that contravenes the statute must be set aside.

129.    The FDCA requires FDA to grant Fast Track designation if (1) the drug is "intended, whether alone or in combination with one or more other drugs, for the treatment of a serious or life-threatening disease or condition" and (2) "it demonstrates the potential to address unmet medical needs for such a disease or condition." 21 U.S.C. § 356(b)(1).

130.    Tradipitant is intended to treat gastroparesis, which FDA agrees is a serious or life-threatening disease or condition, thus satisfying Section 356(b)'s first prong.

131.    FDA ran afoul of the text of the statute's second prong by requiring conclusive evidence that tradipitant's development plan will result in the sort of data that will necessarily achieve marketing approval.

132.    There is no such requirement in the text of Section 356(b), which governs Fast Track designation. Rather, a sponsor must only demonstrate the drug has "the potential to address unmet medical needs." 21 U.S.C. § 355(b)(1).

133.    FDA's application of a heightened standard to Vanda's Fast Track designation request, which frontloads the requirements pertaining to marketing approval, is contrary to the statute.

134.    Because FDA acted contrary to the statutory text, FDA's denial of Vanda's Fast Track designation request for tradipitant was arbitrary and capricious.

**Count II**
**Arbitrary and Capricious Agency Action**
**(differential treatment of similarly situated applicants)**

135.    Vanda incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

136.    FDA denied Vanda Fast Track designation for tradipitant in part because "a partial clinical hold" is preventing Vanda from gathering the "necessary safety data" for chronic use of tradipitant.

137.    But Vanda demonstrated in its Fast Track request that tradipitant had a statistically significant effect in relieving debilitating nausea in patients with gastroparesis over a four-week timeframe, among other symptoms. And no safety concerns emerged with taking tradipitant over this length of time; indeed, the clinical hold is only for use *over three months*.

138.    As a matter of law, Section 356(b) does not require Fast Track applicants to show a drug has the potential to chronically treat a disease as a whole.

139.    As a matter of fact, FDA has not required other Fast Track applicants to demonstrate a drug has the potential to chronically treat a disease. FDA has previously granted Fast Track status to drugs intended to provide acute benefits and for drugs intended to treat only a single symptom of a disease or condition.

140.    A "long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *Iaccarino v. Duke*, 327 F. Supp. 3d 163, 173-174 (D.D.C. 2018) (quoting *Kort v. Burwell*, 209 F. Supp. 3d 98, 112 (D.D.C. 2016)). That is, "[w]here an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld." *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 7 (D.C. Cir. 2009).

141.    By treating tradipitant differently from similarly situated therapies and failing to offer any reasoned explanation for doing so, FDA acted arbitrarily and capriciously, and that action cannot stand.

**Count III**
**Arbitrary and Capricious Agency Action**
**(failure to follow or explain departure from previous agency position)**

142.     Vanda incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

143.     FDA deviated from its previous position without reasoned explanation when it denied Vanda's Fast Track designation request for tradipitant.

144.     FDA previously told Vanda, in a final and formal agency action, that it "see[s] a potential therapeutic role for tradipitant, particularly for the short-term relief of nausea in gastroparesis patients." Accordingly, FDA stated it was "considering an indication for the short-term relief of nausea in gastroparesis."

145.     In denying Fast Track designation for tradipitant, FDA considered the use of tradipitant to treat only chronic gastroparesis, contrary to its previous statements. And it denied Fast Track status notwithstanding its previous statement that it saw "a potential therapeutic role for tradipitant," which is the only element of Fast Track designation at issue.

146.     FDA therefore reversed course in its position on tradipitant, without any explanation.

147.     "[A]n agency changing its course . . . [must] supply a reasoned analysis." *State Farm*, 463 U.S. at 42. The agency must "account[] for any departures" for its previous position. *Edison Elec. Inst. v. EPA*, 391 F.3d 1267, 1269 & n.3 (D.C. Cir. 2004).

148.     FDA's failure to give a valid reason or any explanation at all for departing from its previous position was arbitrary and capricious and contrary to law.

**Count IV**
**Arbitrary and Capricious Agency Action**
**(failure to consider relevant evidence and provide reasoned explanation)**

149.     Vanda incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

150.     An agency must base its actions "on a consideration of the relevant factors" and "examine the relevant data and articulate a satisfactory explanation for its action including a

32

'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citations omitted).

151.    Agency action must be set aside where, as here, the agency "has failed to 'examine[] [the] relevant data.'" *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311-12 (D.C. Cir. 2018) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)). "[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Id.* at 312.

152.    FDA's denial vaguely referenced only the adequacy of Vanda's "overall development plan" and "the lack of necessary safety data and the resulting partial clinical hold" as reasons to deny Fast Track designation. These vague, general statements do not sufficiently explain the basis for FDA's decision.

153.    FDA disregarded considerable evidence before it pertaining to tradipitant's potential to address the unmet medical needs of patients with gastroparesis. FDA did not address whatsoever the thorough data analysis provided in tradipitant's Fast Track application, which demonstrated that tradipitant provided a statistically significant and clinically meaningful benefit in symptom relief to gastroparesis patients receiving the drug.

154.    FDA's failure to address this evidence and provide a reasoned explanation of its denial of Fast Track designation was arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vanda respectfully requests that the Court enter judgment in its favor and that the Court:

(a.)   Set aside and vacate FDA's denial of Vanda's request for Fast Track designation for tradipitant;

(b.)   Declare that FDA may not deny Fast Track designation for tradipitant without

- complying with the requirements of the statute;

- treating tradipitant similarly to similarly situated therapies;

- explaining any departure from its previous position on tradipitant; and

33

- articulating a reasoned explanation of its decision;

(c.)   Award Plaintiff attorney's fees and costs; and

(d.)   Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: May 23, 2022                          Respectfully submitted,

                                             /s/ *Paul W. Hughes*
                                             Paul W. Hughes (Bar No. 997235)
                                             Andrew A. Lyons-Berg (Bar No. 230182)
                                             Alex C. Boota*
                                             MCDERMOTT WILL & EMERY LLP
                                             500 North Capitol Street NW
                                             Washington, DC 20001
                                             (202) 756-8000
                                             phughes@mwe.com

                                             *Counsel for Plaintiff*

                                             *\*pro hac vice motion forthcoming*